Izzie Baylie *et al.*, Plaintiffs-Appellants, *v.* Swift & Company, Defendant-Appellee.

(No. 56401; ▮▮▮▮▮▮▮▮▮▮)

First District (5th Division)—April 11, 1975.

Leonard M. Ring, of Chicago, for appellants.

Hinshaw, Culbertson, Moelmann, Hoban, & Fuller, of Chicago (Perry L. Fuller and D. Kendall Griffith, of counsel), for appellee.

Mr. PRESIDING JUSTICE BARRETT delivered the opinion of the court:

Plaintiff Izzie Baylie sought damages for personal injuries, and Amanda Bailey sought damages for injuries resulting in the wrongful death of her husband, Forest. They alleged that the injuries suffered resulted from a dust explosion at the plant of their employer and were proximately caused by the negligence of defendant. The case was tried before a jury, but the trial court directed a verdict for defendant at the close of plaintiffs' case. Plaintiffs appeal, contending that the evidence was sufficient to raise jury questions.

In the complaint plaintiffs alleged that defendant was negligent in misrepresenting to plaintiffs' employer, A. Cramer Corporation (hereinafter "Cramer"), that calcium stearate, the dust of which allegedly ex-

ploded, was nonflammable; in failing to warn plaintiffs' employer of the explosive characteristics of calcium stearate dust; and in failing to test calcium stearate to determine the explosive characteristics of its dust. Defendant answered that plaintiffs were guilty of contributory negligence, and that any injuries that may have been suffered by plaintiffs were not the proximate result of any misrepresentation or breach of duty that would give rise to legal liability on its part.

We now consider the evidence adduced at trial, to determine whether, when viewed in its aspect most favorable to plaintiffs, it so overwhelmingly favors defendant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504; *Weiss v. Rockwell Manufacturing Co.*, 9 Ill.App.3d 906, 293 N.E.2d 375.

EVIDENCE

The parties stipulated that on July 6, 1963, Izzie Baylie and Forest Bailey were employees of Cramer, working in its mill, grinding calcium stearate that had been forwarded to Cramer by defendant and that the order when finished was to have been sent directly to Monsanto Chemical, defendant's customer.

An answer to an interrogatory was read into the record, indicating that defendant gave no warning or notice to Cramer or its employees concerning the probability of instantaneous combustion, explosion, or flash fire resulting from the dust suspended in the atmosphere during pulverization of calcium stearate.

The following evidence was adduced by plaintiffs.

*Robert H. Causland,* a chemist, testified that he has a background in chemical education and marketing and market development. He started working for defendant in 1947 and was involved with testing the performance of soap products developed by defendant and the uses to which these products could be applied. He did not perform any testing for fire or explosive hazards of products, nor did defendant have a department that made such tests. In 1958 he was trying to develop uses to which calcium stearate could be put.

In general chemical terms, calcium stearate is characterized as a soap, although it is not water soluble. It has been known since about 1900. Defendant began making it in about 1958 and manufactured it in solid form.

Defendant has a milling operation in which it grinds calcium stearate. For certain development, it was necessary to grind the product finer than it was able to do. Thus in the spring of 1958, he arranged for someone else to do the grinding. Defendant learned of Cramer as a custom miller from an advertisement in *Chemical Week.* A custom milling house is an organization that offers its services to anyone who comes to it and asks

for a given material to be reduced in size. He went to Cramer and spoke with Matt Hannon and Jerry Lewis. He told them that he was interested in getting calcium stearate milled into a fine particle. He was advised that for other companies, including General Mills, Cramer had ground things to a fineness of 325 mesh; *i.e.*, most of the grindings could pass through a screen having 325 openings in 1 square inch.

One week later, he talked to Lewis, who inquired about the nature of the product, including its melting point, and the particle size Swift was interested in. They discussed the product's solubility. He told Lewis that Calcium stearate was nonflammable, although he had never made any tests to determine whether the product was flammable.

He believes "flammable" means the characteristic or ability of a material to ignite immediately and burn vigorously. He has taken an open flame, put it to calcium stearate and observed that there is a period during which the material becomes caramel colored and tends to become molten, and darkens. Then for a brief period there is a light flame which is self-extinguishing. The calcium stearate did not burst into flame when he touched it with a match. On the basis of his own test and observations, he has concluded that calcium stearate is not flammable by his definition.

After the witness' second visit to Cramer, Lewis expressed interest in grinding for defendant and requested approximately 100 pounds of the product. Defendant supplied the material in solid form for Cramer to examine and test on their machines and to see how fine they could grind it. Cramer was able to get it very close to 325 mesh.

Thereafter, Cramer commenced grinding calcium stearate for defendant. The witness visited the Cramer plant possibly half a dozen times a year between 1958 and 1963. He lived close to the Cramer plant and thus was the man defendant sent to pick up the samples. When he was away, Robert Wilson, a member of defendant's general superintendent staff, would deal with Cramer. The other people from defendant's operation who visited Cramer from 1959 to July, 1963, included: George Mel, its foreman of the soap factory; Frank Madden, a clerk in the soap factory; Stan Tierney, a chemist and researcher who worked in the laboratory and the person in charge of the research laboratory that dealt with calcium stearate.

His initial visits were limited to the office area. He was first present in the grinding area when calcium stearate was being ground in 1960 and noticed Cramer's grinding equipment, two micro-atomizers. At times when calcium stearate was being ground he saw gray-white dust coming from the grinding area. He saw dust collecting equipment, but he never called the atmospheric condition of the plant to the attention of Hannon or Lewis.

He does not know if Hannon was a chemist or engineer. He understands Hannon's knowledge to be based on what Hannon picked up at Cramer and does not consider Hannon an expert in the field.

In the latter part of June or the first part of July, 1963, defendant received an order for calcium stearate from Monsanto Chemical. He does not know the size of the order. He did not see anyone at Cramer with respect to that order, nor did he talk to plaintiff, Izzie Baylie, on the telephone in late June or early July. He left on vacation on June 29 or June 30 and returned on July 13.

Defendant owned the calcium stearate it shipped to Cramer and title was never transferred to Cramer. It never directed Cramer or any of their employees on how to carry out their duties nor did it have any kind of interest in Cramer.

*Stanley H. Tierney,* called as a witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 60), testified that he has a bachelor's degree and a master's degree in chemistry. He was in defendant's research and development center betwen 1959 and 1963, and from 1960 through 1965 in charge of the research and development group for the chemicals and industry division.

Calcium stearate did not fall into the category of flammable solids as defined by the Interstate Commerce Commission for purposes of shipment, so defendant did not test it for flammability. Melting point tests were run and showed that the material had such a high melting point that, in essence, it would not be considered flammable. Melting point has nothing to do with flammability. The specific meaning of "flammability" in chemical usage is a product that is easily ignited, propagates the flame, and burns readily.

Calcium stearate will burn if it is heated sufficiently, as will practically all organic material. If you put a match to calcium stearate, the material may start to char and burn, but, under normal conditions, the flame is not self-sustaining and will go out when the match is removed. In the powdered form it will burn more readily. It is not a product which will ignite readily and burn persistently.

*George Mel,* a chemical engineer, testified that from 1959 to 1963 he was superintendent of defendant's soap division. He visited the Cramer plant to sample random lots of calcium stearate and to inspect packaging. Hannon told him on his first visit to the plant that he considered their operation to be of a rather classified nature and that he didn't want people observing it too closely. Respecting Hannon's views, on the four or five occasions he passed through the milling area on the way to the storage areas, he did so very quickly and made no observations.

*Izzie Baylie,* plaintiff, testified that he was hired by Cramer in 1958.

He had never been in a grinding plant before he went to work at Cramer. The only previous work he did was in the army and as a car hiker for a restaurant. He reached the fourth grade in school.

He started at Cramer by grinding "versamint." At that time Cramer was also grinding paprika, neofat, and a kind of moss. In 1963, they were grinding paprika, versamint, and wax in addition to calcium stearate. Before 1963, they ground cocoa.

He described the building where the grinding was done and the two fans used for ventilation. One fan had an electric motor in it.

Calcium stearate was ground in a micro mill. In July, 1963, Cramer had two such mills, called the no. 5 and no. 6. For grinding, he would fill the hopper with calcium stearate. There was a magnet at the mouth of the mill. An auger fed the material into the grinding chamber. When the product was finished, the mill would blow it through the chute into a steel box called a dust collector. Inside the dust collecter was a felt bag. Some of the dust escaped from the bag. Most of it was trapped in the dust collector, but some would escape through a rotary airlock, which was supposed to bring the dust into the bag and keep the dust from coming out of the dust collector.

A canvas separated the "annodizing" machine, which was used to grind paprika, from the two micro mills. The canvas was hung to prevent dust from the micro mills from getting in the paprika mill. All three machines were powered by 22-horsepower motors.

There was also a small mill used for testing, a blender machine, a great big hammer mill used for hard grinding, a crusher, and a gasoline powered forklift truck. Cramer's warehouse was a separate building connected to the east wall of the grinding room and divided from that room by a canvas that could be rolled up and down. In the warehouse were a hammer mill and a crusher. Cramer did not have a testing laboratory at the mill.

Smoking was not permitted inside the grinding plant.

Removing dust from the plant was a monthly practice at Cramer's and was followed during the second week in June, 1963. The employees cleaned the floor, the rafter, and the ceiling with a large vacuum cleaner and washed the mills.

On Friday morning, June 28, Hannon was not at the plant; he was supposed to be going on vacation. Causland called and said, "Could you get out maybe 600 bags in five or six days for me? I have got a special order I want to get out between now and Monday." He answered that he would try. He said he would have to work long hours and set up two machines. He explained that to get the two machines going they had to

clean out the no. 6 machine and put in new parts. Causland said, "Go ahead."

He and James Allen disassembled the no. 6 mill and cleaned all the parts that were there. He noticed that they had to have a new dust collector bag and two linings for it.

Causland called back later that afternoon and told him the order had been changed to 800 bags. He told Causland that they did not have certain parts, that Hannon always would order them, and that he himself did not know where they were ordered from. Then Frank Abraham, who knew where to get the parts, came in and finished the conversation.

The parts arrived Tuesday afternoon and he and James Allen began to assemble the mill.

Wednesday morning they vacuumed and cleaned up the plant. From 9:15 on, the four men of the first shift were running two mills. When calcium stearate is being ground, dust comes out of the mills. With the second mill going, there was more dust in the room. The gray dust took a long time to come down from the air and settle. The concrete floor and the men's clothes became dusty, and visibility became difficult.

The men worked Thursday and Friday. On Saturday morning, James Allen joined him and his brother, Forest. Forest had started at Cramer in 1962 and had not previously worked in a grinding mill. They got the no. 5 and no. 6 machines going at 6:40 and were grinding calcium stearate to 325 mesh. The fans were in operation.

Between 9:00 and 9:30 there was a boom. He saw a ball of blue-grayish fire, heard another boom, and found himself outside. The explosions were within seconds of one another. There was a forklift truck in the area whose engine had been off about 25 minutes. The weather was warm, but not hot. It was very humid. The doors and windows were open.

The deposition of *Matthew Hannon*, since deceased, was read into the record.

He owns not quite 50 percent of Cramer's stock. In 1953 he went into the grinding business with a Dr. Siehrs and a Dr. Cramer as A. Cramer Corporation. At that time he had no prior grinding experience. In 1958 he began to work full time for Cramer in the office.

Dr. Siehrs had experience grinding cocoa or chocolate at Krim-Ko Corporation, where he operated a mill in an advisory capacity. He would come to meetings at Cramer, but he served in an advisory capacity only. When Hannon had a question concerning whether a particular product would be accepted for grinding and the product was not listed in the book of chemicals, he would ask the two doctors.

In 1953 or 1954 Gerald Lewis was hired to operate the Cramer plant.

Lewis had no background in grinding or pulverizing and taught himself the simple operation. By the time he left he was a pretty handy man around a mill, but not an expert. After Lewis left in 1959 or 1960 he took over as general manager and ran the plant. When he was away from the plant, Izzie Baylie was in charge. Baylie could do anything he could do, except make decisions on the phone or discharge an employee.

In 1957 or 1958 defendant answered Cramer's advertisement in a chemical journal. Before accepting calcium stearate for grinding, Cramer wanted to find out whether it was flammable, explosive, or had toxic odors. They tried to burn it in solid form and in powder form. When they put a match to it, it wouldn't burn. They looked up the product in a book that defines different chemicals and determined it was acceptable for their line.

The plant was open to Causland, who performed tests to determine the finest grind Cramer could get on the machine and watched as Izzie Baylie or Jerry Lewis ran other products through the testing mill. As far as he knew, Causland was the boss at Swift.

At times the grinding operation was very dusty. Cramer supplied breathers to its employees. It is common in the grinding industry to have dust escape from pulverizing or atomizing machines. Calcium stearate gave out less dust than some things Cramer ground and about as much dust as cocoa.

They have had two machines working on the same product, but they had never ground different products in the micro mills simultaneously, lest they get the various materials together.

He inspected the plant after the fire. A gasoline-powered forklift truck was in the building that caught fire. The gasoline was stored in a can in a storeroom, in the building that did not catch fire. He saw solid calcium stearate, as well as calcium stearate in powdered form in bags, in drums, and in the hopper of the mill. None of it was burned. The paper burned off from the drums and bags full of calcium stearate and the product fell off in a pile.

*James Allen,* in addition to corroborating certain testimony of other witnesses, testified that he was employed at Cramer for 3 years prior to the fire at the plant on July 6, 1963. When he first came in on that date he opened the door, through which a 1-ton truck could pass. He opened approximately 10 windows in the grinding room and turned on the fans. He started the mill. Then he crushed the 50-pound boxes of calcium stearate and took them to the grinders.

That morning it was so stuffy that one could hardly breathe in the grinding room. The fans and open door and windows helped a little if the wind was blowing in the direction of the door. There was quite a bit

more dust than usual because, for the first time, they were using both mills to grind calcium stearate. They were also running the crusher more than usual in order to supply both mills. The dust settled all around the top of the pressing machine and they couldn't see in that area. There was no dust collector on the crusher, nor were the crushers and mills connected to any exhaust. The calcium stearate was so fluffy that they had to vacuum the floors to clean it up; otherwise it came up in one's pants leg.

He drove the worklift about 15 minutes before the fire. It is a jeep with forks which raises material up and down and is operated by a gasoline motor. After he used the forklift to put calcium stearate into the mill, he switched the truck off, checked the hopper of the mill and oiled the bearings. Then he helped Izzie check the bags and stack them and went back to the mill. He heard a boom and found himself outside.

*Earl Vogelsanger,* chief of the Oak Lawn Fire Department. He answered the fire alarm at the Cramer plant on July 6, 1963. Although from his fire training he has some knowledge of the cause, origin, propagation, and spread of fires and explosions prior to that time he had never investigated or been trained to investigate a dust explosion. He was unable to determine the cause of the explosion, but it occurred in the grinding room.

In order to have an explosion there must be a flammable material, *i.e.,* some thing that can burn, as well as oxygen atmosphere, and an ignition source. Humidity, temperature, and the concentration of the dust in the air are factors. The material being ground at the time of the explosion was a combustible material. Any kind of flame or electric spark would have served as an ignition source.

At the plant, after the explosion, there were small bags on fire in the warehouse, which did not burn down. White dust was burning and smelled like wax. When they threw water on it, it would flare up and repel the water. Eventually, they were able to put the fire out with water, using a fog stream. After the investigation they found that the burning substance was the powder that was being ground.

The spread of the fire was due to an accumulation of dust, which is a hazardous condition in any grinding mill. To a certain extent, the grinding of any organic material would produce a potential dust explosion hazard. The hazard is increased when a combustible material is reduced to fine particles. On almost every prior inspection of the Cramer plant, they found an accumulation of dust, which they recommended be cleaned up. Judging from the last inspection, he concluded it was not cleaned up.

*Chester Grelecki,* a doctor of physical chemistry, testified that his pres-

ent business involved defining explosion hazards that are associated with chemicals and chemical processing. He knows of no literature available before 1963 that told of the explosive hazard of calcium stearate, although the dust explosion phenomenon has been known for some time.

To create a dust explosion there must be the proper particle size, the proper concentration of dust dispersed in the atmosphere, and the proper ignition source. The finer the particle, the greater the violence of the reaction. Temperature and humidity do not matter if there is the right concentration of a given chemical, but there must be enough oxygen. Often dust explosions are sequential. If there were no accumulation in the air of dust capable of being exploded, then nothing else would happen except the first little flash.

Different people use different definitions of flammability. In his industry, a nonflammable product is one that cannot support combustion or burn under any conditions. People with training in the field of chemistry should know that only things that are completely oxidized lack the ability to burst into flame when they are dispersed into the air under the proper circumstances. Calcium stearate is a flammable product. At trial he ignited chunk and powder samples of calcium stearate, and each burned. The latter flared up, as would about 95 percent of organic matter. His tests revealed that for 325 mech calcium stearate, the minimum amount of electrical energy required to ignite the dust was roughly equivalent to a spark created by touching a door knob after walking across a long rug on a dry winter day. As particle size increases, more energy is required for ignition and a greater minimum concentration is needed to sustain combustion.

In response to a hypothetical question based on the testimony previously elicited from other witnesses, he concluded that based upon a reasonable degree of scientific certainty, a calcium stearate dust explosion would be the only thing that would cause the kind of result that was found. The fact that one of the operators saw a blue flame would indicate that there probably was electric discharge. The potential ignition sources would include switches, electric wiring, and motors found in the grinding room. The actual source would be very difficult to determine because the amount of energy required to ignite a dust cloud like the one in the Cramer plant is very small.

*Mel Mickevic* testified that he is technical director of a custom-pulverizing firm and has a degree in engineering.

The dust-explosion phenomenon was known generally by those engaged in the grinding business in 1963. Almost all organic or combustible materials and some noncombustible and inorganic materials, when ground into finely divided particles and put into the air under certain

precise conditions, can cause an explosion. The smaller the particle, the more oxygen surrounds it, and the greater the intensity of the flame. The concentration of the dust is a factor, as are temperature and humidity. The amount of energy for ignition varies according to the nature of the product.

He visited the Cramer plant on the Tuesday following the fire and inspected the grinding area. The fans of Cramer's microatomizers had not been balanced and thus produced heat. In his opinion the Cramer dust collectors were unsafe and were operated over capacity. If a dust collector is throwing dust out of the collector, it should be shut down immediately.

The elimination of sources of ignition is one of the minimum operating standards of the grinding industry. This would include having nonarcing electrical wiring, keeping all control equipment other than safety on-off equipment as far as possible from the grinding area, keeping the area free from rubbish and debris, and not using a gasoline operated jeep during the pulverizing operation.

Those control units at Cramer that were visible were mounted within the grinding room. The switches were open type or knife switches and gave off a tremendous arc. The insulation of the wiring was essentially a residential household type, open boxes.

There is also a standard with respect to ventilation: the more ventilation the better.

When a grinder is used to take material from the larger form to the smaller, the operation should be hooded or protected to prevent dust.

When a product comes in to his business, they test a sample to determine whether it has a tendency to ignite. If it ignites, they record this fact and handle the product with respect. The fact that a product burns is of minor importance in their type of operation. Flammability is a safety factor, but not a limiting factor.

The explosive properties of a finely divided product are something that every custom miller should be aware of. He would think it necessary to advise a miller of the explosive propensities in a product when finely divided, if that product when finely divided has properties that it did not possess in the solid state.

After he inspected the Cramer plant, his business started to grind calcium stearate for defendant. They have also ground it for other companies. At the time they accepted the product they inquired as to its flammability. They ran tests by taking a blow torch and setting fire to some of the shipping boxes. It burned when supported by the burning paper and had a tendency to go out when the burning paper was removed. When placed on tinfoil on a gas burner, the product did not

have a tendency to vaporize or to seek the flame. They did not test it in its powder form.

Calcium stearate presents no greater hazard to the pulverizing or grinding industry than any other grinding product, except sand or something of that nature which cannot be made to participate in a dust explosion.

OPINION

Plaintiffs contend on appeal that the evidence they presented at trial is sufficient to allow a jury to find that (1) defendant breached its duty to give warning of the explosion hazard of calcium stearate to plaintiffs; (2) defendant breached its duty to determine the flammability and explosion hazard of calcium stearate; and (3) defendant's alleged negligent misrepresentation that calcium stearate is nonflammable was a breach of duty for which defendant is liable.

Defendant argues that as a matter of law (1) it owed no duty to plaintiff with regard to the testing of calcium stearate and the giving of a warning; (2) its alleged negligence was not the proximate cause of plaintiffs' injuries; (3) plaintiffs were guilty of contributory negligence and (4) it was not guilty of negligent misrepresentation. We reverse the trial court and remand for a new trial.

We consider plaintiffs' contentions first.

### I.

■■ In Illinois, the duty to warn exists where there is unequal knowledge, actual or constructive, and the defendant, possessed of such knowledge, knows or should know that harm might or could occur. (*Kirby v. General Paving Co.*, 86 Ill.App.2d 453, 229 N.E.2d 777.) An alternative formulation of the duty is found in section 388 of the Restatement (Second) of Torts.

> "One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> > (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
> >
> > (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
> >
> > (c) fails to exercise reasonable care to inform them of its dangerous condition or the facts which make it likely to be dangerous."

The predecessor of this section has been cited with approval in *Biller v. Allis Chalmers Manufacturing Co.*, 34 Ill.App.2d 47, 180 N.E.2d 46.

In the case at bar, we believe there is sufficient evidence for a jury to conclude that the aforementioned conditions were all met. As for (a), Causland was aware of the use to which the calcium stearate was put; he saw the product being ground at Cramer's plant. He was a chemist who was involved with developing uses for calcium stearate. A jury might reasonably infer from these facts that he knew the chemical composition of calcium stearate and that he knew or should have known of the explosive dangers inherent in a product having such a composition.

As for (c), defendant stipulated that it warned neither Cramer nor plaintiffs of the explosion hazard created by powdered calcium stearate when it is suspended in the atmosphere during a grinding operation. A jury might find that this constituted a failure to exercise reasonable care to inform plaintiffs of the dangerous condition or of facts that make the product likely to be dangerous.

Finally we consider whether the condition in paragraph (b) was met. Comment *k* to section 388 indicates that the dangerous condition may be readily observable but be one that only persons of special experience would recognize as dangerous. If the supplier has such experience and knows the condition involves danger, then he is required to inform those who use the product of the risk only if he has no reason to believe that they will have such special experience as will enable them to perceive the danger. This is akin to the notion of "unequal knowledge" in the *Biller* case and appears to reflect the thinking of this court when it noted that "[t]he purpose of warning is to apprise a party of the existence of a danger of which he is not aware * * *. There is no duty to warn against risks which are known and obvious." *Bakovich v. Peoples Gas Light & Coke Co.*, 45 Ill.App.2d 182, 188-9, 195 N.E.2d 260.

As defendant maintains, the evidence shows that the danger of dust explosions has been known in the grinding business for some time prior to the explosion in question. Indeed, the United States Court of Appeals for the Fourth Circuit, in an opinion delivered in 1931, noted that the phenomenon "has long been known." (*Cornec v. Baltimore & O. R. Co.* (4th Cir. 1931), 48 F.2d 497.) Defendant argues that the duty to warn did not arise where Cramer held itself out as a custom grinder and plaintiffs were experienced in grinding at the time of the explosion, because defendant is not required to assume that they did not know the hazards of their own business. Furthermore, one is not required to anticipate the negligence of another. (*Bakovich*, 45 Ill.App.2d 182.) Defendant claims that Cramer was negligent in failing to warn its employees of the danger

of dust explosions and in failing to conduct its operation in conformity with safety standards prevailing in the grinding industry.

Defendant attempts to support these arguments with several cases, only one of which, *Bakovich*, was decided by an Illinois court. In that case, the plaintiff, an employee of a contractor, sued the defendant for its alleged failure to warn of the existence of an underground gas main that exploded when a coemployee broke into it with a power shovel. The court applied the general principles urged by defendant, in the instant case, and ordered that a judgment notwithstanding the verdict be entered for defendant. But it noted that the defendant had the right to assume that the contractor was aware of the location of the mains, since they were plainly shown on a plan supplied to the contractor. In addition, the sequence of events showed that the defendant could not have foreseen that the contractor intended to demolish a certain vault and as a result of that act break the gas main.

In the instant case, the evidence gives rise to a question of fact as to whether the danger of explosion was "known and obvious," as were the existence of the gas main and the risk of breaking it in *Bakovich*. Here, also, a jury could reasonably find that defendant should have foreseen that Cramer would grind the calcium stearate under such circumstances as would have been likely to result in injury to plaintiffs. Although the foreseeability may not have existed when the dealings with Cramer first began, after some time passed Causland had the opportunity to observe the Cramer operation. He saw the condition of the equipment, the ventilation, and dust in the air while the grinders were working. A jury could infer that he knew the factors that contribute to a dust explosion—something that the evidence indicates every chemist should know—and that from the conditions prevailing in the plant he had reason to believe that no one connected with Cramer appreciated the risk of an explosion.

■■ Thus, accepting the general rule that a defendant has the right to assume that a plaintiff's employer knows his business and will not act negligently, we think the evidence is sufficient to allow a jury to find that under the circumstances of this case these assumptions were, in fact, unwarranted. In all the cases cited by defendant, there is no indication that the defendant was aware of facts that would lead him to conclude that the party to whom he supplied a product was unaware of a danger inherent in the use of the product or would fail to guard against it. Here, that evidence is present and presents a question for the jury.

## II.

Plaintiffs' next contention is that defendant owed them not only a duty to inform them of the danger of a calcium stearate dust explosion, but

also a duty to "exercise reasonable care to discover its dangerous condition or character, and to inform those whom [Swift] should expect to use it," because the product was to be used for defendant's business purposes. (Restatement (Second) of Torts § 392 (1968).) Although at first glance the section seems applicable to this fact situation, Comment *a* indicates that the purpose of the section is to impose a duty on the supplier to "subject the article to such an *inspection* as the danger of using it in a *defective* condition makes it reasonable to require of him." (Restatement (Second) of Torts § 392 (1968), Comment *a*, emphasis added.) Plaintiffs have not called to our attention a single Illinois case that adopts this section of the Restatement or the principles stated therein, and the Illinois cases we have found apply a similar rule to the duty to inspect for defects but not to the duty to test a product to determine its inherent qualities. We note, however, that defendant's failure to use its facilities to test calcium stearate is relevant to the determination of whether defendant had reason to know that the product was likely to be dangerous, as discussed above in Part I.

## III.

■■ Plaintiffs also maintain that they proved a prima facie case of negligent misrepresentation against defendant. Although neither plaintiffs nor defendant have indicated any cases in Illinois that define the elements of a cause of action for negligent misrepresentation, all parties agree that one element that plaintiffs must prove is that they reasonably relied upon defendant's alleged misrepresentation that calcium stearate was not flammable. (Restatement (Second) of Torts § 311 (1968), Prosser, *Handbook of the Law of Torts* § 108 (4th ed. 1971).) The evidence is uncontradicted that Cramer was concerned about flammability, but it also shows that they made tests to determine whether calcium stearate would burn and consulted a reference book before determining that calcium stearate was acceptable for grinding at Cramer. Thus, in accepting the product for grinding under conditions prevailing at the plant, there is no evidence to support the inference that anyone at Cramer relied on Causland's alleged misrepresentation that calcium stearate is nonflammable.

Since we are remanding for a new trial, the counts based on misrepresentation should be stricken.

## IV.

Defendant urges that we affirm the verdict directed in its favor on the issue of its duty to warn because its alleged negligence in failing to inform plaintiffs of an explosion hazard was not the proximate cause of plaintiffs' injuries. It contends that, at most, by supplying the calcium

stearate they provided the condition or occasion for the explosion and that the grinding of the product was a subsequent, independent act which was the intervening efficient cause of the explosion, rendering its alleged negligence remote and not actionable.

■■ Assuming *arguendo* that the grinding of the product by plaintiffs was an intervening act, we note that not every intervening act sufficiently insulates the initial wrongdoer from liability. The causal connection is not broken by such an act if the intervening act was itself foreseeable by the first wrongdoer. The question of whether this intervening conduct was within the range of reasonable anticipation and probability is a factual question for the jury to determine. (*Green v. Welts*, 130 Ill.App.2d 600, 265 N.E.2d 188.) Here, a jury could easily have found that the manner in which the calcium stearate would be used by plaintiffs was foreseeable to defendant. The question of proximate cause should have been submitted to the jury.

■■ Defendant contends that the directed verdict should be affirmed because plaintiffs were guilty of contributory negligence as a matter of law, in that they knew or should have known of the minimum safety standards of the grinding industry and failed to observe them. The issue of contributory negligence is ordinarily resolved by the jury. (*Jines v. Greyhound Corp.*, 33 Ill.2d 83, 210 N.E.2d 562.) An essential element of contributory negligence is that the person to be charged therewith knew, or in the exercise of ordinary care should have known, of the circumstances or condition out of which the danger arose. (*Bitner v. Lester B. Knight & Associates, Inc.*, 16 Ill.App.3d 857, 307 N.E.2d 136.) Here the evidence was sufficient for a jury to find that plaintiffs did not actually know of the danger of a dust explosion and that in the exercise of ordinary care they would not have been informed of this danger nor been apprised of facts sufficient to enable a reasonable person to realize that the danger existed.

For the foregoing reasons, the judgment is reversed and the cause remanded for proceedings not inconsistent with this opinion.

Reversed and remanded.

DRUCKER and LORENZ, JJ., concur.