FIRST DIVISION 
 SEPTEMBER 9, 1996

No. 1-94-4150

IZZIE BAYLIE and AMANDA BAILEY, ) APPEAL FROM THE
as Special Administrator of the ) CIRCUIT COURT
Estate of FOREST BAILEY, ) OF COOK COUNTY.
 )
 Plaintiffs-Appellees, )
 )
v. )
 )
SWIFT & COMPANY, ) HONORABLE
 ) LEONARD GRAZIAN,
 Defendant-Appellant. ) JUDGE PRESIDING.

 PRESIDING JUSTICE CAMPBELL delivered the opinion of the
court:
 Defendant, Swift & Co. (Swift) appeals from a $6.2 million
judgment entered against it and in favor of plaintiffs, Izzie
Baylie and Amanda Bailey, as special administrator of the Estate
of Forest Bailey. On appeal, Swift contends that: (1) the trial
court erred in striking its affirmative defense of laches;
(2) the trial court erred in failing to dismiss the action based
on laches; (3) the trial court erred in failing to grant Swift's
motion for judgment notwithstanding the verdict; and (4) the
trial court erred in failing to grant Swift's motion for a new
trial, based on alleged enumerated trial errors. For the follow-
ing reasons, we affirm.
BACKGROUND
 The following facts are relevant to this appeal. Izzie
Baylie (Izzie) and his brother Forest Bailey (Forest) were
injured as a result of an explosion and fire that occurred on
July 6, 1963, at the A. Cramer Company (Cramer), in Oak Lawn,
Illinois. Izzie and Forest were employed by Cramer, a custom
milling operation, to grind calcium stearate for use in a soap
product manufactured by Swift. 
 Plaintiffs filed a negligence action in 1964, alleging that
Swift had failed to warn Cramer that calcium stearate presented a
risk of explosion under certain circumstances. Following a jury
trial in May 1971, the trial court directed a verdict for Swift. 
In December 1975, this court reversed and remanded the case for a
new trial, finding the jury should have been permitted to deter-
mine whether Swift had a duty to warn plaintiffs of the danger of
a calcium stearate dust explosion. Baylie v. Swift & Co., 27
Ill. App. 3d 1031, 327 N.E.2d 438 (1975) (Baylie I).
 In July 1994, the case was re-tried before a jury resulting
in a $6.2 million judgment against Swift. Much of the evidence
presented at the 1994 trial duplicates the evidence presented in
Baylie I. Therefore, we recite the facts only to the extent
necessary to resolve the matters now before us.
1994 TRIAL
 At trial, William Blew testified that he was employed by
Swift as a chemical engineer in research and development depart-
ment from 1951-1971. Swift manufactured various types of soaps,
the components of which were produced as a by-product of its meat
production operations. In 1959, Blew developed and patented a
method for efficiently producing calcium stearate in solid form.
 Swift eventually discovered other markets for calcium
stearate, including uses as an anti-caking agent in salt, cos-
metics and pharmaceuticals, and as a waterproofing agent. For
these applications, calcium stearate had to be crushed to a non-
uniform grind, resulting in a "325 mesh" fine powder form. To
achieve a 325 mesh, the ground substance must pass through a
screen consisting of 325 openings per square inch. In 1959, Swift
contracted with Cramer to grind the calcium stearate to 325 mesh
because Swift did not have the means or the expertise to do so. 
 Blew had no knowledge that calcium stearate was flammable or
explosive. However, Blew stated that if he had reason to believe
that a product created by Swift was either flammable or combust-
ible, Swift was responsible for testing its product. Blew was
not knowledgeable about dust explosions. Although he was gener-
ally familiar with the Federal Bureau of Mines (Bureau), he did
not know that the Bureau could test compounds manufactured by
industry for explosibility.
 Blew testified that the general properties of a material
were determined at Swift's research center which employed 
chemists and chemical engineers. Swift's research center anal-
yzed calcium stearate for numerous properties. Although Swift
was equipped to determine the flash point of materials, Swift did
not determine the flash point of calcium stearate.
 The 1971 trial testimony of Dr. Robert Causland, and Oak
Lawn Fire Captain Earl Vogelsanger was read to the jury. 
 Causland testified that on the basis of his own testing of
calcium stearate, the material was not flammable. Causland
informed Cramer personnel that the material was not flammable. 
On his visits to the Cramer plant, Causland noticed gray-white
dust coming from the grinding area, but never called the atmo-
spheric condition of the plant to the attention of Cramer person-
nel. Causland denied talking to Izzie Baylie on the telephone in
late June or early July 1963 regarding a calcium stearate order
from Monsanto Chemical. Causland stated that he left for vaca-
tion on June 29 or June 30, and returned on July 13, 1963. See
Baylie I, 27 Ill. App. 3d at 1035. 
 Vogelsanger determined that the explosion in the grinding
room was caused by an accumulation of dust, which is a hazardous
condition in any mill. On almost every prior inspection of the 
Cramer plant, the Fire Department found an accumulation of dust,
which they recommended be cleaned up. Vogelsanger concluded that
the plant was not cleaned as requested. See Baylie I, 27 Ill.
App. 3d at 1039.
 In addition, the evidence deposition of Matthew Hannon, who
died prior to the 1971 trial, was read into the record. Hannon
was the general manager of the Cramer plant beginning in 1960.
Neither Hannon nor his predecessor, Gerald Lewis, had any back-
ground in grinding or pulverizing. Hannon stated that it was
Cramer's policy not to accept flammable or explosive materials
for grinding. Hannon consulted with his partners, Dr. Siehrs and
Dr. Cramer, as well as with a chemical book, before accepting a
particular product for grinding. See Baylie I, 27 Ill. App. 3d
1037-38. 
 Plaintiff then read Swift's answers to certain interroga-
tories into the record. The interrogatories were answered by
George Mehl, the leader of the Soap Division at Swift at the time
of the explosion. Mehl stated that Swift employed "scores of
chemists and chemical engineers," and that Swift supervisory
personnel, including Causland and Mehl, visited the Cramer plant
on numerous occasions. Mehl further stated that Swift gave no
warning to Cramer or any employees regarding the probability of
instantaneous combustion, explosion or flash fire resulting from
the dust suspended in the atmosphere during the pulverization of
calcium stearate. Mehl stated that calcium stearate is non-
flammable, and therefore does not have the requisite properties
to arrive at a flash point.
 Dr. Chester Grelecki then testified as an expert witness on
plaintiffs' behalf. Dr. Grelecki is the president and chief
scientist of Hazards Research Corporation (Hazards), a consulting
firm which provides hazardous material testing services to the
chemical processing industry. 
 Dr. Grelecki defined an explosion as a very rapid expansion
of a high pressure gas. A dust explosion occurs where the source
of the high pressure gas combusts, emitting finely dispersed
particles into the atmosphere. The properties that control the
violence of the dust explosion are the rate at which the dust
burns, and how fast it produces expandable gas. The faster the
dust produces the gas, the more violent the explosion.
 The rate at which dust produces gas depends on how finely
the dust is divided. A small particle is consumed by flame
faster. Very tiny 10 micron particles, the average size of
particles used in the milling operations, have a very rapid rate
of consumption by flame.
 Dr. Grelecki stated that calcium stearate does indeed have a
flash point when pulverized. Before any material burns, it must
vaporize. Combustion occurs during the vapor phase in the
visible flame. When heated to the point of liquification,
calcium stearate would have enough vapor to burn.
 In 1971, Hazards evaluated the explosibility of calcium
stearate, based on the standards established in 1960 by the
Federal Bureau of Mines (Bureau). The Bureau was created to
measure the explosibility of coal dusts in the 1920s or 1930s. 
In the late 1930s or early 1940s, the Bureau performed explosi-
bility tests on other materials for the chemical industry. As
such, Dr. Grelecki stated that Swift could have submitted calcium
stearate to the Bureau in the 1950s for an evaluation at an
estimated cost of $20. Prior to 1968, the Bureau tested thou-
sands of chemicals for explosibility and filed reports. A Bureau
report published in that year concluded that calcium stearate
dust constituted a severe explosion hazard. This information
could have been known in the 1950s through testing methods
available, although the Bureau did not test calcium stearate for
explosibility until 1968.
 Hazards performed tests on three different sizes of calcium
stearate; the smallest sample milled at 325 mesh. The 325 mesh
sample had the fastest reaction time in burning and exploding,
giving it a severe rating comparable to that of cornstarch, which
has been long known to be a severe hazardous dust. 
 Hazards' evaluation revealed that a 325 mesh particle could
ignite with a spark. Dr. Grelecki explained that dust explosions
come in pairs: first there is a small explosion which disperses
other material into the atmosphere, thereby causing a second,
larger explosion. 
 In Dr. Grelecki's opinion, based upon a reasonable degree of
certainty relating to physical chemistry in fire and explosion
hazards, the cause of the explosion on July 6, 1963, was the
combustion of finely divided calcium stearate. His opinion was
based on the fact that calcium stearate was the only material in
the area in quantities large enough to produce the resulting 
explosion effects that resulted. In Grelecki's opinion, Swift
had the responsibility to divulge to Cramer the combustion
characteristics of calcium stearate because Swift manufactured
the material. 
 Dr. Grelecki further opined that the ventilation and the
electrical facilities in the Cramer plant were inadequate, and
that the equipment being used was not adequate for milling
calcium stearate to 325 mesh and packing it in the manner in
which it was packed. These conditions should have been apparent
to Swift, as Swift representatives visited the Cramer plant and
saw that housekeeping was poor and that there was dust in the
atmosphere. Dr. Grelecki stated that Swift should have known
during the first week of July 1963, when Cramer employees were
working a double shift to satisfy a rush 800-bag-40,000 pound
order, that Cramer was not equipped to operate two mills at the
same time for the first time, because it would double the amount
of dust in the atmosphere.
 On cross-examination, Dr. Grelecki admitted that if Swift
had searched the scientific literature available regarding the
explosive possibilities of calcium stearate prior to the time of
the explosion, Swift would not have found any published reports
or articles. The explosion occurring on July 6, 1963, is the
only explosion of calcium stearate about which Dr. Grelecki is
aware.
 Izzie Baylie testified that he began working at the Cramer
plant in 1958. Shortly thereafter, Forest Bailey and Izzie's
brother-in-law James Allen began employment at Cramer. 
 Initially, Izzie operated the crusher machine which crushed
material through a 50 mesh screen. Izzie described the work
environment as "real dirty." He stated that the workers had to
change clothes and wash their glasses often. Smoking was not
permitted inside the grinding plant. 
 After six months, Izzie began working with calcium stearate
every day. The material was delivered from Swift in 50-pound
boxes twice a week, and Izzie broke large chunks of the material
with a sledgehammer in order to fit the pieces into the crushing
machine. The material was then lifted by truck in a pallet, and
put into 50-pound drums, which were driven over to the micro
grinding mills, numbered 5 and 6. Prior to July 6, 1963, the two
mills had never been operated simultaneously. Izzie described
the grinding operation in great detail, as he did in Baylie I. 
See Baylie I, 27 Ill. App. 3d at 1036-37. 
 Izzie testified that to his knowledge, Causland was in
charge of calcium stearate production for Swift. Causland
visited the Cramer plant once or twice a week when Cramer was
milling calcium stearate. On those occasions, Causland checked
the different pulverizing strains in the lab, then returned to
the plant and retrieved some of the calcium stearate out of a
bag. Causland either weighed the material in the plant or took
it into the lab.
 Cramer ran two shifts during the month of June 1963. The
first shift worked 7 a.m. until 3:30 p.m., and the second shift
worked from 3 p.m. until 11:30 p.m. Izzie stated that on a
Friday, in latter part of June 1963, Causland called and ordered
600 bags of calcium stearate for delivery in five or six days. 
Izzie said he could not have that many bags ready in that time
with only one machine running. Izzie told Causland that machine
no. 6 was out of operation, explaining that the machine had to be
refitted with new parts in order to pulverize to a 325 mesh. 
The parts arrived on the following Tuesday, July 2. On Wednesday
July 3, five Cramer employees worked the day shift, and four
worked the night shift. On July 4th and 5th, both machines were
running simultaneously. 
 When Izzie came into work in the morning after both machines
had been running, the plant was full of dust, and there was dust
in the air. Exhaust fans helped to clear some of the dust until
the mills started again. 
 Izzie stated that he spoke with Causland on Friday,
July 5th, around 11 a.m. At that time, Causland stated that the
order had been increased to 800 bags. Izzie stated that they
would have to work over the weekend to fill that order.
 On Saturday, July 6, Izzie arrived at work at 6 a.m. Allen
and Forest worked with Izzie that day. Izzie was expecting two
other men, but they failed to show up. The three men started
operating both mills, rotating the various jobs required. 
 Later in the morning, as Izzie was stitching bags, he heard
a boom. He looked back and saw a ball of fire between each dust
collector on the north wall. Izzie was on fire, and he fell on
some bags. Izzie went to check on Forest and Allen. Immediately
thereafter, another explosion occurred, and Izzie was catapulted
out of the building. Prior to July 6, 1963, Izzie did not know
whether or not calcium stearate was flammable or combustible.
 The parties stipulated that Dr. Archie Cramer died in July
1993, and Dr. Arthur Siehrs died in May 1987. The parties
further stipulated that Izzie Baylie has a life expectancy of
13.1 years.
 Swift introduced the prior trial testimony of George Mehl,
who died in April 1993. From 1959 until 1963, Mehl was the
superintendent of the soap division. Mehl visited the Cramer
plant four to five times. He passed through the milling area
very quickly to get to another part of the plant, because he was
there to sample random lots of product and to inspect packaging. 
He made no observations of the manufacturing area because he was
a guest in Cramer's plant.
 Following closing arguments and jury instructions, the jury
returned a verdict in favor of plaintiffs and against Swift,
awarding $4,250,000 to Izzie Baylie and $1,950,000 to the estate
of Forest Bailey. The trial court entered an order denying
Swift's post trial motion in its entirety on October 27, 1994. 
This timely appeal followed.
OPINION
 Initially, Swift contends that the trial court erred in
striking Swift's defense of laches, and in failing to dismiss the
action on the basis of laches. Swift argues that plaintiffs are
guilty of laches on the following bases: plaintiffs demonstrated
a lack of due diligence in bringing the case to trial, evidenced
by the various periods of inactivity between the time the case
was renumbered after remand in 1975 and the trial in 1994;
plaintiffs offered no plausible excuse or reason for the delay
and lack of diligence; Swift was seriously prejudiced by plain-
tiffs' dilatory conduct in that over the years, a number of wit-
nesses died or became incompetent and the law changed in Illi-
nois, thereby depriving Swift of the defense of contributory neg-
ligence; and the impact of the time delay on the jury reflected
poorly upon Swift.
 Laches is defined to be such neglect or omission to assert a
right, taken in conjunction with lapse of time of more or less
duration, and other circumstances causing prejudice to an adverse
party. National Underground Construction Co. v. E. A. Cox co.,
273 Ill. App. 3d 830, 652 N.E.2d 1108 (1995); Renth v. Krausz,
219 Ill. App. 3d 120, 123, 579 N.E.2d 11 (1991). A party is
guilty of laches which ordinarily bars the enforcement of his
right where he remains passive while an adverse claimant incurs
risk, enters into obligations, or makes expenditures for improve-
ments or taxes. Pyle v. Ferrell, 12 Ill. 2d 547, 147 N.E.2d 341
(1958). 
 Laches is an equitable doctrine to be invoked or rejected in
the trial court's discretion. Miller v. Bloomberg, 126 Ill. App.
3d 332, 466 N.E.2d 1342 (1984). In any event, the mere passage
of time does not establish laches. Cox, 273 Ill. App. 3d at 834;
Patrick Media Group v. City of Chicago, 255 Ill. App. 3d 1, 7,
626 N.E.2d 1066 (1993). 
 In the present case, the record shows that the case was
reinstated and renumbered twice, both in 1975 and 1993, without
objection by Swift. The record shows that Swift had at the very
least two opportunities to file a motion to dismiss the case
based on laches, and failed to do so. Both parties were granted
numerous motions to continue the case. On February 4, 1993,
attorneys from both sides met in the chambers of Judge O'Connell
and agreed to make final trial preparations and to renumber the
case with a "93 L" number. An agreed order between plaintiffs'
attorney Leonard Ring and the Hinshaw Culbertson law firm setting
the case for trial was entered on February 11, 1993. 
 Between June 4, 1993, and January 27, 1994, the case was
continued several times at the request of both parties. On
February 4, 1994, Leonard Ring died. Two months later, the trial
court entered an agreed order continuing the case until June 8,
1994. On May 26, 1994, the law firm of Cassiday Shade and Gloor
was granted lave to substitute its appearance for the Hinshaw
firm. The next day, Swift filed its motion to dismiss the case
based on laches, which was denied by the trial court. Plaintiffs
filed their fourth amended complaint on June 7, 1994, and Swift
filed its answer including an affirmative defense of laches. 
Plaintiffs moved to strike Swift's defense of laches.
 An evidentiary hearing commenced on the issue of Swift's
laches defense. The laches hearing reveals that between 1975 and
1989, Ring made a few attempts to get the case back on the trial
call. Hinshaw attorney Joseph O'Connell testified that at some
point, he considered the case abandoned by the plaintiffs, but
that he did nothing. O'Connell stated that between the Hinshaw
firm and Ring, no time formal rules were followed regarding, for
example, disclosure of expert witnesses, answering interroga-
tories, or substituting witnesses. All agreements were oral,
including O'Connell's agreement to wait until trial to present a
laches motion, at Ring's request. O'Connell further testified
that Leonard Ring died in the course of negotiating a settlement
with Swift out in California. Based on this testimony the trial
court concluded that laches was not an appropriate defense at
this late date in the lawsuit. 
 In determining whether a party has reinstated a case within
a reasonable time, a trial court should take into account the
totality of the circumstances, particularly any reason proffered
for undue delay. Cox, 273 Ill. App. 3d at 836. The totality of
the circumstances necessarily includes the conduct of the defen-
dants. "[T]he propriety of applying the doctrine of laches
depends on the conduct and situation of all the parties, not
solely upon those of one." O'Brien v. Meyer, No. 1-94-2874
(May 17, 1996), slip op. at 10 (citing 27 Am Jur 2d Equity 162
(1966)). Furthermore, an adverse party may not take advantage of
a delay to which he has contributed; and laches may not be
imputed from a plaintiff's delay in pursuance of an agreement
with the defendant that the latter will not take advantage of it
or under such circumstances as to show an acquiescence in the
delay by the defendant. It is also said that a continued recog-
nition or acknowledgement by the defendant of the plaintiff's
right is generally sufficient to account for delay; and that the
defendant's silence or other conduct may indicate acquiescence in
the plaintiff's right. O'Brien, slip op. at 11 (citing 30A
C.J.S. Equity 147 (1992)).
 Our supreme court has stated that "it is only when by delay
or neglect to assert a right the adverse party is lulled into
doing that which he would not have done or into omitting to do
that which he would have done * * * had the right been properly
asserted that the defense of laches [will] be considered." 
Rogers v. Barton, 386 Ill. 244, 253, 53 N.E.2d 862 (1944). Under
the facts and circumstances of the present case, we find that any
delay in going forward with the case is attributable to both
sides. Therefore, the trial court properly struck Swift's
affirmative defense of laches. 
 We also find unavailing Swift's argument that it was seri-
ously prejudiced by the unavailability of witnesses. The cases
relied upon by Swift are distinguishable. See, e.g., Resnick v.
Reznitsky, 56 Ill. App. 3d 418, 371 N.E.2d 1114 (1977) (In an
action for breach of an oral trust, decedent's heirs delayed
asserting their claim for 14 years until all witnesses who could
testify as to the nature and extent of the decedent's assets had
died). In the present case, there is no evidence that plaintiffs
knowingly and voluntarily caused the delay in this case in order
to ensure that all possible witnesses were deceased at the time
of trial. Forest Bailey and Matthew Hannon died prior to the
first trial in 1971. Hannon's deposition testimony taken prior
to the 1971 trial was read into the record in its entirety. The
record shows that Swift failed to depose either Archie Cramer or
Arthur Siehrs at any time prior to their deaths in 1993 and 1987
respectively. Plaintiffs and defendants were equally impacted by
the unavailability of witnesses and the passage of time. 
 As stated above, laches is discretionary with the trial
court, and is not appropriate based on time alone. Because Swift
has not provided any evidence to show a complete abandonment of
the case by the plaintiffs, the trial court properly refused to
dismiss the case based on laches.
 Swift's further argument that it should have been allowed to
proceed to trial under the contributory negligence theory avail-
able prior to the law establishing comparative negligence in
Alvis v. Ribar, 85 Ill. 2d 1, 421 N.E.2d 886 (1981), is unsup-
ported by any citation to authority. Alvis clearly states that
the law stated therein is to apply to all cases in which trial
commences after June 8, 1981. Alvis, 85 Ill. 2d at 28.
 Next, Swift contends that the law of the case, as set forth
in Baylie I, limits the imposition of a duty to warn to the
elements of the duty as set forth in the Restatement (Second) of
Torts, section 388. See Baylie I, 27 Ill. App. 3d at 1042. 
Swift argues that it is not liable under section 388 because it
did not know of a risk of calcium stearate, nor did it have
reason to believe that the plaintiffs would not appreciate such a
risk. 
 However, Baylie I did not hold that upon retrial, plaintiffs
were limited to proving the elements of section 388. Baylie I
reversed a directed verdict for Swift, and remanded the case for
a new trial to allow the jury to make a factual determination.
 The Baylie I court stated that under Illinois law, "a duty
to warn exists where there is unequal knowledge, actual or
constructive, and the defendant, possessed of such knowledge,
knows or should know that harm might or could occur." Baylie I,
27 Ill. App. 3d at 1042 (citing Kirby v. General Paving Co., 86
Ill. App. 3d 453, 229 N.E.2d 777). The court continued that an
alternative formulation of the duty is found in section 388, and
concluded that there was sufficient evidence presented at the
first trial for a jury to conclude that all of the conditions of
section 388 were met. The law of the case therefore did not
prevent the current jury from considering whether Swift had a
duty to warn.
 In the present case, the record shows that Swift did not
test calcium stearate for flammability, although the means to do
so were available at that time. While it is undisputed that
there was no scientific literature available at the time that
calcium stearate dust presented a possible hazard, literature was
available showing that fine dust of other materials presented a
hazard of explosion. Swift could have submitted a sample to the
Bureau of Mines for testing. In the alternative, Swift had a
large research department capable of testing the material for its
flash point, and could have performed the same test using equip-
ment designated by the Bureau of Mines. 
 Swift further argues that the trial court erred in failing
to instruct the jury that under section 388(b) of the Restate-
ment, Swift had no reason to believe that Cramer or the plain-
tiffs would not appreciate any potential risks involved in grind-
ing calcium stearate. Section 388(b) limits liability to the
supplier of chattel if the supplier "has no reason to believe
that those for whose use the chattel is supplied will realize its
dangerous condition."
 Jury instructions are provided to inform the jury of the
correct principles of law which apply to the evidence presented.
Poelker v. Warrensburg Latham Community Unit School Dist. No. 11,
251 Ill. App. 3d 270, 621 N.E.2d 940 (1993); Gaskin v. Gold-
wasser, 166 Ill. App. 3d 996, 1009, 520 N.E.2d 1085, 1092 (1988). 
The trial judge has discretion in determining which issues have
been raised by the evidence and which instructions will be
tendered to the jury. Ralston v. Plogger, 132 Ill. App. 3d 90,
98, 476 N.E.2d 1378, 1383 (1985). 
 In the present case, the jury was instructed that defendants
were negligent in one or both of the following respects in that
they:
 "(a) Supplied its calcium stearate to Cramer
 for pulverizing without adequate testing for
 flammability, combustibility and its ability
 to explode while in a fine powder form;
 "(b) Failed to warn employees of Cramer that
 calcium stearate was capable of burning,
 combusting and exploding in 325 mesh form
 when Swift knew, or should have known, that
 its calcium stearate was susceptible to burn-
 ing, combusting and exploding while in fine
 powder form."
The above instructions reflect the correct principles of law
applied to the evidence presented at trial. Swift has not shown
that it was seriously prejudiced by the trial court's refusal to
give its instruction based on section 388(b), where meeting the
conditions of section 388 were not a requirement of this case. 
 Next, Swift contends that the law of the case based on 
Baylie I established that Swift had no duty to test calcium
stearate in 325 mesh form prior to supplying it to Cramer for
grinding. 
 Prior to trial, plaintiffs moved to amend their complaint to
include an allegation that Swift violated its duty to adequately
test calcium stearate in 325 mesh form. Meanwhile, Swift moved
in limine to bar argument at trial that Swift should have tested
calcium stearate in 325 mesh form. The trial court denied the
plaintiffs' motion without prejudice, and denied Swift's motion
in limine, reserving its ruling until hearing the evidence at
trial. The trial court noted that the case was "couched in
negligence," and that numerous issues would arise during the
trial as the facts unfolded.
 In Baylie I, this court held that while plaintiffs provided
no authority for their contention that Swift owed them a duty to
"exercise reasonable care to discover [the] dangerous condition
or character [of calcium stearate], and to inform those whom
(Swift) should expect to use it," that Swift's failure to use its
facilities to test calcium stearate was relevant to the determi-
nation of whether Swift had reason to know that the product was
likely to be dangerous, and that this was a proper question for
the jury. Baylie I, 27 Ill. App. 3d at 1045. 
 The evidence at trial in fact disclosed that Swift had the
capability to test the material for flammability and explosi-
bility, but that it failed to do so. Evidence of the so-called
"duty to test" was thus intertwined with Swift's duty to warn and
was properly before the jury.
 Next, Swift contends that it owed no duty to plaintiffs
because they were employed as independent contractors. Swift's
reliance on Fris v. Personal Prods. Co., 255 Ill. App. 3d 916,
627 N.E.2d 1265 (1994), and Weber v. Northern Illinois Gas Co.,
10 Ill. App. 3d 625, 295 N.E.2d 41 (1973), is misplaced. Fris
held that an owner of a building owed no duty to an employee of
an independent contractor with respect to injuries the employee
suffered in connection with a routine and incidental aspect of
his job. Fris, 255 Ill. App. 3d at 925. (Emphasis supplied).
 The present case is distinguishable from construction cases
involving "methods of work," as in Fris. Here, Swift provided
the calcium stearate product to Cramer for grinding. As such,
Swift had a duty to warn of any dangers involved with working
with the product.
 Swift further contends that even if it breached a duty owed
to the plaintiffs, that breach was not the sole proximate cause
of the plaintiffs' injuries, therefore it is not liable. Swift
argues that the conduct of Cramer and/or the plaintiffs was the
sole proximate cause of the explosion that injured the plain-
tiffs. 
 In any negligence action, the plaintiff bears the burden of
proving not only duty and breach of duty, but also that defendant
proximately caused plaintiff's injury. Smith v. Eli Lilly & Co. 
137 Ill. 2d 222, 232, 560 N.E.2d 324 (1990); see 1 M. Polelle &
B. Ottley, Illinois Tort Law Sec. 14.23 (2d ed. 1994).) A defen-
dant in a negligence action may provide a defense that he is not
the sole proximate cause of a plaintiff's injury. Leonardi v.
Loyola University, 168 Ill. 2d 83, 658 N.E.2d 450 (1995). The
defense does not mean that the plaintiff must prove that the
defendant is in fact the sole proximate cause of plaintiff's
injury. 
 In the present case, the evidence did not reveal that Cramer
was the sole proximate cause of the plaintiffs' injuries. Cramer
was not a defendant in this case. The jury found that Swift
breached its duty to warn plaintiffs of the hazards associated
with the milling of calcium stearate and entered its verdict
accordingly.
 Swift also contends that substantial evidence was presented
at trial for the jury to find Izzie Baylie comparatively negli-
gent. However, the evidence at trial failed to prove that Izzie
Baylie was careless and negligent in any of the ways alleged by
Swift. The evidence revealed that Izzie had less than a fourth
grade education, and no education, training or experience regard-
ing the explosibility of calcium stearate dust. Thus, the trial
court properly refused instruct the jury on the theory of con-
tributory negligence.
 Next, Swift contends that the trial court erred in admitting
into evidence Causland's testimony that calcium stearate was not
flammable. Swift argues that this evidence violated the law of
the case established in Baylie I.
 In Baylie I, this court struck plaintiffs' counts based on
negligent misrepresentation because there was no evidence at
trial which suggested that anyone at Cramer relied on Causland's
alleged misrepresentation that calcium stearate is non-flammable. 
Baylie I, 27 Ill. App. 3d at 1045. The court did not rule that
Causland's testimony was inadmissible. Thus, admission of
Causland's testimony on re-trial was not against the law of the
case.
 Swift also contends that the trial court improperly excluded
a certain portion of Mehl's testimony as hearsay. The trial
court excluded Mehl's account of a conversation he had with
Matthew Hannon (also deceased) as follows:
 "Mr. Hannon expressed concern that he consid-
 ered their operation of a rather classified
 nature. He didn't -- he didn't want people
 to observe it too closely."
Swift argues that the statement was proper because it explained
why Mehl walked through the plant quickly, and because it was
admitted in the 1971 trial without any objection.
 We find that the trial court properly excluded that portion
of Mehl's testimony as hearsay because it was offered to prove
the truth of the matter asserted, e.g., that Cramer prohibited
Swift employees from observing the Cramer grinding facilities.
 Swift further contends that the trial court erred in denying
its motion in limine to bar Dr. Grelecki from testifying regard-
ing Swift's duty to warn plaintiffs of the dangers of calcium
stearate. 
 In support, Swift cites Coyne v. Robert H. Anderson &
Assoc., Inc., 215 Ill. App. 3d 104, 574 N.E.2d 863 (1991) and
Sohaey v. Van Cura, 240 Ill. App. 3d 266, 607 N.E.2d 253 (1992). 
Both cases are distinguishable. In Coyne, the issue was what
responsibilities an engineering firm had both by contract and
under the Structural Work Act, regarding a construction project. 
This court held that this was a factual determination to be made
by the jury, and therefore expert testimony as to who was "having
charge of the work" was improper because the jury could make that
determination without expert testimony. Coyne, 215 Ill. App. 3d
at 112.
 Similarly, in Sohaey, this court found that the trial court
properly excluded expert testimony as to the standard of care for
real estate brokers because an expert witness is not competent to 
testify regarding statutory interpretation or to make conclusions
a jury could make without the testimony. Sohaey, 240 Ill. App.
3d at 283.
 In the present case, Grelecki's testimony was not premised
on case law and statutes. Grelecki testified as to Swift's
responsibilities within the chemical manufacturing industry,
based on his education and experience. Therefore, Grelecki's
testimony was proper.
 Finally, Swift contends that the trial court erred in
striking a portion of Swift's cross-examination of Grelecki and
in barring defense counsel from questioning Grelecki regarding
the fact that he failed to offer opinions in the 1971 trial. 
 The record shows that Swift sought to impeach Grelecki by
omission. The trial court reviewed Grelecki's testimony in
Baylie I, and determined that there was not sufficient informa-
tion to conclude that Grelecki should have expressed the same
opinions in the first trial. The trial court found that Grelecki
was not retained to testify for the same purposes in the 1971
trial. Thus, the trial court properly barred Swift from attempt-
ing to impeach Grelecki by omission. 
 For all of the reasons stated above, we therefore affirm the
judgment of the circuit court.
 Affirmed.
 BUCKLEY, J., and BRADEN, J., concur.