LAWRENCE E. ELAM, Plaintiff-Appellee, v. LINCOLN ELECTRIC COMPANY *et al.*, Defendants-Appellants.

Fifth District   No. 5—04—0120

Opinion filed December 20, 2005.

886

Richard C. Godfrey, P.C., Helen E. Witt, Michelle H. Browdy, and Barry E. Fields, all of Kirkland & Ellis, LLP, and D. Patterson Gloor, Morgan M. Strand, and Donald F. Ivansek, all of Cassiday, Schade & Gloor, LLP, both of Chicago,

and Jeffrey S. Hebrank, of Burroughs, Hepler, Broom, MacDonald, Hebrank & True, of Edwardsville, for appellants.

Robert W. Bosslet, Jr., of Bosslet & O'Leary, Ltd., of Granite City, and Robert G. McCoy, of Cascino Vaughan Law Offices, Ltd., of Chicago, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiff, Lawrence Elam, who suffers from a central nervous system injury diagnosed as Parkinson's disease, filed a negligence and products liability action against defendants, Lincoln Electric Company (Lincoln Electric), Hobart Brothers Company, and Airco/The BOC Group, Inc. (Airco), manufacturers of welding rods. Plaintiff alleged defendants failed to investigate the harms they were aware of relating to manganese in welding rods and failed to warn of those harms. Plaintiff claimed the failure to investigate and the failure to warn caused his Parkinson's disease.

Plaintiff began working for his employer, Union Electric Company, which later became Ameren Corp. (Ameren), in 1967. He held several jobs, including machinist apprentice, pipefitter, and ultimately, welder. Over the course of his career, he was exposed to intense welding fumes, oftentimes working with a number of welders in enclosed, poorly ventilated spaces. Welding fumes contain manganese, a known neurotoxin that penetrates the blood-brain barrier and harms the basal ganglia. While plaintiff was provided with protective gear, he never wore it due, in part, to the confined spaces in which he worked. Plaintiff could not recall any welders who used the protective gear. In 1995, plaintiff was diagnosed with Parkinson's disease by Dr. Joseph Black, a neurologist, after experiencing classical symptoms of the disease, including fatigue, tremors, stiffness, and a mask-like face. In 1996, plaintiff retired from Ameren.

Within the welding industry, manufacturers, including defendants, control and dominate safety and health activities. They do so by creating, within trade organizations in which they are members, committees, subcommittees, and task forces assigned to investigate health hazards in the welding industry and to write and publish precautionary product information. In 1967, a warning label was placed on welding rod containers, stating, "Welding may produce a concentration of fumes and gases hazardous to health." The warning cautioned users to avoid breathing the fumes and gases and use proper ventilation. The welding industry was specifically advised by the American Welding Society (Society), of which all defendants are members, to study the problem of chronic manganese poisoning, but it failed to follow the recommendation.

In 1979, the warning was updated but again failed to include any mention of manganese, even though substantial evidence existed showing that manganese is toxic if inhaled. In 1986, welding rod manufacturers added a product sticker which noted that certain chemicals, including manganese, may be hazardous. In 1991, the product sticker was updated as follows: "Warning, the following chemicals may be hazardous during welding: Iron, manganese, silicon, titanium dioxide. Lung and nervous system damage may result from overexposure." These warnings were placed on the cartons that contained the welding rods. The evidence showed that the welders seldom saw the cartons because the rods had been already removed from the cartons by the time they were used by the welders.

On July 27, 2001, plaintiff filed his complaint, in which he alleged defendants (1) were negligent in failing to investigate the health hazards associated with welding and in failing to provide adequate warnings with their mild steel welding rods and (2) should be held strictly liable because of the alleged lack of investigation and adequate warnings. After a four-week trial in the circuit court of Madison County, the jury returned a $1 million general verdict in favor of plaintiff. The trial court entered a judgment in favor of plaintiff in the amount of $925,000, reflecting a setoff for a prior settlement. On appeal, defendants argue the trial court erred as a matter of law in refusing to enter a judgment in favor of defendants because (1) defendants in fact gave warnings, which plaintiff admitted he did not read, and thus the alleged failure to warn did not cause plaintiff's injuries and (2) plaintiff was diagnosed with Parkinson's disease, a disease for which medical science has yet to identify a cause, and there is no credible scientific literature or expert testimony linking manganese in welding fumes to plaintiff's Parkinson's disease. In the alternative, defendants contend they are entitled to a new trial due to numerous alleged errors and/or abuses of discretion on the part of the trial court. We affirm.

■ In this appeal, defendants filed a motion to strike plaintiff's brief or, in the alternative, to strike certain portions of plaintiff's brief for a failure to comply with Supreme Court Rule 341 (188 Ill. 2d R. 341) and for relying on materials not presented at the trial. This court denies defendants' motion. Because the record is voluminous and defendants raise numerous complex issues and subissues, this court will address the necessary facts regarding each issue and subissue as they arise.

## I. DIRECTED VERDICT OR JUDGMENT NOTWITHSTANDING THE VERDICT

■ The first major issue raised in this appeal is whether the trial

court erred in failing to direct a verdict or enter a judgment notwithstanding the verdict (judgment *n.o.v.*) in favor of defendants. We point out that the standard of review in deciding whether a trial court erred in refusing to direct a verdict or enter a judgment *n.o.v.* is rigorous. A directed verdict or judgment *n.o.v.* is only proper in a case in which all the evidence when viewed in the light most favorable to the nonmoving party so overwhelmingly favors the movant that no contrary verdict based upon the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). *Pedrick* emphasizes that parties have a right to have substantial factual disputes resolved by the jury.

## A. Failure to Read Warnings

Defendants argue the trial court erred in denying their motions for a directed verdict or a judgment *n.o.v.* on plaintiff's claim that defendants failed to adequately warn of a causal nexus between fumes from mild steel welding rods and Parkinson's disease because plaintiff did not and could not show that any inadequacy in the warnings provided by defendants proximately caused his Parkinson's disease. Defendants insist that because plaintiff knew warning labels were present on defendants' products but chose not to read them, plaintiff's failure-to-warn claim fails as a matter of law. Plaintiff responds that defendants' obscure warnings and acknowledged failure to supply warnings to welders show the trial court was correct in denying defendants' motions.

Defendants rely on *Kane v. R.D. Werner Co.*, 275 Ill. App. 3d 1035, 657 N.E.2d 37 (1995), in which our colleagues in the First District held that a plaintiff cannot maintain a products liability action premised on a failure-to-adequately-warn theory where a plaintiff admits he never read the given warnings. We find *Kane* distinguishable from the instant case. In *Kane*, the worker's argument was not that the inadequacies of the warning labels prevented him from reading them but, rather, that the *content* of the labels was inadequate. The *Kane* court determined that because the plaintiff failed to read the warnings, any inadequacy in the content of the warnings could not have proximately caused the plaintiff's injuries and the trial court properly granted a summary judgment. *Kane*, 275 Ill. App. 3d at 1037, 657 N.E.2d at 39. The *Kane* court specifically agreed, however, that " 'a plaintiff who does not read an allegedly inadequate warning cannot maintain a negligent-failure-to-warn action *unless* the nature of the alleged inadequacy is such that it prevents him from reading it.' " (Emphasis added.) *Kane*, 275 Ill. App. 3d at 1037, 657 N.E.2d at 39, quoting *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963, 971 (Ala.

1985). Here, the evidence indicates defendants packaged the relevant warnings in a way that virtually guaranteed plaintiff and others within the welding trade would not read them.

The evidence at the trial showed that the warnings were placed on the cartons in which the welding rods were distributed. Testimony was presented that welders tended not to see the cartons. For example, a letter dated June 7, 1967, was introduced into evidence. In that letter, the chief engineer for the electrode division of defendant Lincoln Electric explained that many welders who used the electric welding rod would never see the container on which the warning label appeared. Dr. Zimmerman, an expert in industrial hygiene, reviewed the warning labels and testified that the first warning label issued in 1967 was not effectively communicated because it was only placed on the welding rod can, not on the rod. Dr. Zimmerman explained that because the label was only on the can, the welders would often not even see the warning because they tended to get the rods from a location other than the can.

Dr. Zimmerman also explained that the warning label was not effectively communicated because it was directed only toward welders, and not toward welders' assistants or other bystanders who are within the plume of the welding fumes. Dr. Zimmerman analogized the situation to secondhand smoke in the cigarette industry. He explained a smoker knows what he is putting into his lungs and has the benefit of the warning on the cigarette package, but a nonsmoker standing nearby may not even be aware he is inhaling secondhand smoke and does not have the benefit of seeing the warning on the cigarette package. Under these circumstances, where the evidence indicates defendants intentionally placed the warnings in a place where plaintiff would be unlikely to read them, we are unconvinced by defendants' argument that plaintiff's failure-to-warn claim fails as a matter of law. Sufficient testimony was presented to submit the issue to the jury.

### 1. *General Verdict*

■ We also point out that a general verdict was entered in the instant case. Under section 2—1201(d) of the Civil Practice Law (735 ILCS 5/2—1201(d) (West 2002)), a general verdict can be sustained on any of several bases of liability and will not be reversed due to the impairment of one of the theories. *Witherell v. Weimer*, 118 Ill. 2d 321, 329, 515 N.E.2d 68, 72 (1987). Therefore, even if the inadequacy of the warnings was not the proximate cause of plaintiff's injuries and the failure-to-warn claim should have been dismissed as a matter of law, plaintiff could still recover under the separate theory of defendants' breach of a duty to investigate the health hazards associated with welding.

## 2. *Failure to Investigate*

■ Contrary to defendants' assertions, there is significant evidence in the record showing a link between Parkinson's disease and manganese in welding fumes, and there is significant evidence supporting plaintiff's claim that defendants breached their duty to investigate the health hazards associated with welding. Plaintiff introduced numerous scientific articles regarding industrial manganese poisoning. For example, plaintiff's exhibit No. 7, an article entitled "Industrial Manganese Poisoning," was published by the United States Public Health Service in 1943. The article points out that industrial manganese poisoning has been recognized since 1837, when there was a report of five workers being affected, and explains, "Industrial manganese poisoning occurs through the absorption of vapor, fumes[,] or dust through the respiratory system following the inhalation of dust of manganese ore or the fumes from the fusing of the manganese in steel manufacture." Fed. Security Agency, U.S. Pub. Health Serv., Nat'l Inst. of Health Bull. No. 182, Industrial Manganese Poisoning 6 (1943). Considering the number of workers exposed, the article concludes that manganese poisoning is rare but does occur. The article specifically states, "The most important pathological changes in man are those which occur in the central nervous system, with the resultant development of the [P]arkinsonian syndrome." Industrial Manganese Poisoning at 6.

Plaintiff's exhibit No. 4, a 1932 German article that discusses manganese poisoning in welders during the 1920s, concludes, "Electric arc welding can be a health risk for the welder, because of the manganese fumes generated from the electrode." E. Beintker, *Manganeinwirkung bei dem elektrischen Lichtbogenschweißen*, Zentralblatt für Gewerbehygiene 207, 211 (1932) (plaintiff's translation at p. 8). It also discusses how a form of manganese poisoning can occur in welders. Plaintiff's exhibit No. 3, a June 1977 publication by the United States Department of Health, Education, and Welfare on occupational diseases and a guide to their recognition, discusses chronic manganese poisoning at length. U.S. Dep't of Health, Education, & Welfare, Pub. Health Serv., Ctr. for Disease Control, Nat'l Inst. for Occupational Safety & Health, Occupational Diseases: A Guide to Their Recognition (rev. ed. 1977) (Occupational Diseases Guide). It concludes that as the disease progresses its symptoms are "indistinguishable from classical Parkinson's disease." Occupational Diseases Guide at 369. The record is replete with articles, scientific papers, and testimony showing a correlation between welding and Parkinsonism.

Dr. Alexander Lesnewich, who holds a Ph.D. in metallurgical engineering, testified for plaintiff regarding a proposed epidemiologi-

cal study. Dr. Lesnewich worked for defendant Airco from 1952 until his retirement in 1985. Since 1974, he had been a member of the Society and organized the research subcommittee of the safety and health committee of the Society. He was also a member of the Society's technical activities committee. He agreed that a 1958 technical document lists manganese as a potentially toxic material. In 1979, during his tenure with the Society, the Franklin report was issued. The Franklin report was a technical summary of medical literature published by the Society. The purpose of the Franklin report was to help determine the health hazards of welding fumes. Dr. Lesnewich read the report's conclusions regarding manganese intoxication as follows:

> " [']Epidemiology. Although a number of cases[']—they have a bunch of references here—[']have been reported, there are no recent studies reported in the literature that explore the magnitude of the problem of chronic manganese poisoning in welders. In the future epidemiology—in future epidemiology studies of various welding populations, the prevalence of this disease should be investigated.['] "

Despite this conclusion, no epidemiology study was conducted by the Society.

Dr. Lesnewich was specifically asked about a 1976 lawsuit involving a person named Acie Nobels and a document he wrote in connection with that case. Dr. Lesnewich read from the notation as follows:

> " [']Welder since 1960 at age 50. In 1960 working different jobs, mostly outdoors. He is very ill. Perfectly clear lungs. Has neurological[']—I can't read that. [']Only manganese could cause that. Had been making tetraethyl lead years ago. Lead could do the same.['] "

Minutes from one of the Society's meetings from which Dr. Lesnewich was absent were introduced and state as follows:

> "Mr. Kinser observed that in mild steel welding a significant amount of manganese appears in the fume. In view of the several court cases alleging manganese poisoning, it would seem appropriate to include some kind of neurological examination to indicate the possible connection with manganese exposure to the epidemiological study."

The Society's safety and health committee went so far as to hire a doctor, Dr. Mastrometteo, to develop a study.

Minutes from a December 4, 1981, meeting show that neurological testing was to be included, yet no study was ever done. A review of the record here shows that defendants were well aware of a possible causal link between manganese in welding fumes and the development of Parkinson's disease or a central nervous system disorder with Parkinson's-like symptoms. Despite this knowledge, defendants failed to investigate the health hazards of manganese in the welding fumes.

As previously set forth, defendants did not appeal the jury's verdict on the failure-to-investigate count. Defendants' appeal is based on the claim that there is no link between welding and Parkinson's disease and, thus, no duty to warn. Accordingly, even if we are incorrect on the failure-to-warn claim, the verdict can be sustained on the failure-to-investigate count, which defendants did not appeal. *Moore v. Jewel Tea Co.*, 46 Ill. 2d 288, 294, 263 N.E.2d 103, 106 (1970).

In their reply brief, defendants argue that no cause of action exists in Illinois for a failure to investigate the alleged dangers of a product. Defendants rely on an unpublished order, which has no precedential value pursuant to Supreme Court Rule 23(e) (166 Ill. 2d R. 23(e)), and *Baylie v. Swift & Co.*, 283 Ill. App. 3d 421, 434, 670 N.E.2d 772, 782 (1996), which does not support defendants' assertion. With regard to a "duty to test," *Baylie* stated:

> "The evidence at trial in fact disclosed that Swift had the capability to test the material for flammability and explosibility[ ] but that it failed to do so. Evidence of the so-called 'duty to test' was thus intertwined with Swift's duty to warn and was properly before the jury." *Baylie*, 283 Ill. App. 3d at 434, 670 N.E.2d at 782.

Likewise, in the instant case, the issue of a failure to investigate was properly before the jury. Plaintiff provided evidence that defendants were aware of the hazards associated with manganese in welding fumes but ignored the dangers and ignored advice to perform an epidemiological study. We find that plaintiff alleged a legal theory under which liability could attach.

## B. Causal Connection

### 1. *Plaintiff's Disease*

■ Defendants next complain plaintiff failed to establish a causal link between welding fumes and Parkinson's disease. Defendants insist plaintiff's diagnosis of idiopathic Parkinson's disease precludes a finding of liability because, by definition, idiopathic means that the cause of the disease is unknown. We disagree with defendants' logic.

As plaintiff points out, the jury was not instructed that in order to find defendants liable, there must be a finding that plaintiff suffers from Parkinson's disease. Rather, the jury was instructed that in order to find defendants liable, plaintiff must prove "defendants knew or should have known that welding fumes increased the risk of *central nervous system injury*." (Emphasis added.) Defendants objected to the use of the term "central nervous system injury" on the basis that it did not conform with Illinois's pattern jury instruction in that it was a modification of the instruction. Plaintiff's counsel defended instructing the jury in this manner, arguing as follows:

> "In terms of the central nervous system injury, your Honor, while

it is the defendant's position that this—[plaintiff's] condition is exclusively and only called Parkinson's disease, that is not what Dr. Nausieda said. That is not what Dr. Racette said. That is not what Dr. Margolis said. Their testimony is that there is a continuum or a spectrum of this disease and it is a central nervous system disorder and we're just talking about semantics. But[ ] we do not have to be tied or characterized or categorized into one specific injury only. And[,] of course, they want that to be idiopathic Parkinson's disease. What we're dealing with is a spectrum or continuum of central nervous system disorders, which is in essence what the defendant has conceded. So, we submit the instruction is appropriate and conforms to the proof and evidence in this case."

The trial court offered defendants the opportunity to respond, but defendants declined. The jury was then instructed using the term "central nervous system injury" rather than "Parkinson's disease." Defendants have not appealed giving the central-nervous-system-injury instruction.

The record in this case supports use of the term "central nervous system injury." The evidence is overwhelming that manganese can cause a central nervous system injury. Even defendants' expert, Dr. Olanow, conceded that manganese damages the brain. In discussing idiopathic Parkinson's disease, plaintiff's expert, Dr. Margolis, explained that idiopathic means that there is no known cause for a disease; he stated, however, "But I think that's better phrased [']we don't know the cause yet.['] " Dr. Margolis diagnosed plaintiff as suffering from "Parkinson's as a welder." He explained the basis of his diagnosis as follows:

"Based on the fact that [plaintiff] was a welder. Based on the fact that [plaintiff] has Parkinson's disease or looks like Parkinson's disease. Looks like idiopathic Parkinson's disease and his manganese exposure plus my knowledge at that point of the literature in regard to manganese and [P]arkinsonism."

Dr. Margolis was then asked what he knows from literature about the manganese effect on the central nervous system. He replied:

"Basically manganism or manganese toxicity is a disorder that occurs when you are exposed to excessive amounts of manganese. And it effects [sic] the basal ganglial, the putamen (ph), the pallidum[,] which is part of the basal ganglium[,] and patients for the most part develop a syndrome that was manifested initially as a psychosis, what we call manganese madness[,] and then they developed a movement disorder that had a lot of postural tremor, a lot of rigidity, a lot of dystonia, and in the extreme form this abnormal walk referred to as this cock-walk[,] [w]here one would walk with their arms out on the balls of their feet. There were

some other nuances of manganism that were different than idiopathic Parkinson's disease[—][p]rimarily more proximal tremor, the type we see in other disorders such as Wilson's disease. And then there's also some literature showing—you asked me about the literature or my knowledge of [m]anganese?"

Dr. Margolis went on to discuss literature he has read on the topic and studies that have been done which show an increased incidence of what looks like idiopathic Parkinson's disease in the welding population. According to Dr. Margolis, the literature indicates that welders do have an increased incidence of what looks like idiopathic Parkinson's and that their PET scans look just like patients with Parkinson's, and not like the patients with manganism.

Likewise, Dr. Martinez testified he looked at all the possibilities for plaintiff's Parkinsonism, such as genetics, drug abuse, viral encephalopathy, antipsychotic drugs, stroke, and more. He concluded, "The only thing that stands out like a mountain on a plain by itself is [plaintiff's] long, continuous workplace exposure to manganese, that is[,] which is a known cause of [P]arkinsonism and has been known for a very long time." This is but a fraction of the expert testimony and compelling scientific material before the jury that described the common symptoms in welders exposed to manganese.

Moreover, the record indicates an overlap in the terms "Parkinson's disease," "Parkinsonism," and "central nervous system injury." Even defendants' expert, Dr. Black, who first diagnosed plaintiff, agreed that "welding is considered a cause of [P]arkinsonism." The defendants' arguments regarding idiopathic Parkinson's disease distort the evidence in the record.

## 2. *Admissibility of Evidence*

Defendants also contend that plaintiff's causal-link theory was based upon speculative expert opinions and preliminary data that was inadmissible under Illinois law. Defendants object to Dr. Margolis in general and complain that his causation opinions were based on speculation. They challenge Dr. Martinez on the basis he is unqualified and his methodology failed to conform to the requirements for expert testimony. Defendants also object to testimony concerning what was commonly referred to as the Gulf Coast study on the basis that (1) the data proffered by plaintiff that of 20,000 workers studied, 2,000 to 2,500 have become ill is untrue and (2) even putting aside the falsity of the results, the Gulf Coast study is so methodologically flawed that it does not constitute admissible evidence. Plaintiff responds that the opinions and methodology offered by his experts are admissible under Illinois law. We agree with plaintiff.

In Illinois, the admissibility of expert scientific testimony is

governed by the "general acceptance test" set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 76-77, 767 N.E.2d 314, 323-24 (2002). Under the general acceptance test, scientific evidence is only admissible at a trial if the methodology upon which the opinion is based is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014. " '[G]eneral acceptance' does not concern the *ultimate conclusion*. Rather, the proper focus of the general acceptance test is on the *underlying methodology* used to generate the conclusion." (Emphasis added.) *Donaldson*, 199 Ill. 2d at 77, 767 N.E.2d at 324.

A dual standard of review now applies to the trial court's admission of expert scientific testimony. The questions of whether an expert scientific witness is qualified to testify and whether the proffered testimony is relevant are left to the trial court's discretion. However, the trial court's analysis of the admissibility of scientific evidence is subject to *de novo* review. *In re Commitment of Simons*, 213 Ill. 2d 523, 530-33, 821 N.E.2d 1184, 1189-90 (2004). In conducting a *de novo* review, the reviewing court may consider sources outside the record, including legal and scientific articles, as well as court opinions from other jurisdictions. *In re Commitment of Simons*, 213 Ill. 2d at 531, 821 N.E.2d at 1189.

In the instant case, there is no dispute that plaintiff suffers from Parkinson's disease, a central nervous system injury. The dispute centers on whether plaintiff's central nervous system injury can be linked to manganese in welding fumes. After careful consideration, we find that the jury was properly allowed to hear the evidence and the experts' opinions and draw its own conclusions.

We disagree with defendants' contentions regarding Dr. Margolis's and Dr. Martinez's qualifications and causation opinions. Dr. Margolis is a neurologist experienced in treating patients with central nervous system injuries such as Parkinson's disease. He was able to connect plaintiff's symptoms to manganese exposure in welding fumes based upon the numerous articles and scientific literature that link manganese exposure in welders to Parkinson's and Parkinson's-like symptoms. Dr. Martinez is a toxicologist with doctoral degrees in both toxicology and chemistry. His background qualified him to give an opinion about the toxicity of manganese and its effects. The trial court was aware that Dr. Martinez had been qualified as an expert in another toxic tort case, *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 930-31 (8th Cir. 2001). Dr. Martinez personally interviewed plaintiff and applied his knowledge and expertise and concluded that plaintiff's central nervous system injury was caused by manganese in welding fumes. Dr.

Martinez's background and methodology are reliable. It was not an abuse of the trial court's considerable discretion to permit him to render an opinion on causal connection.

As for the Gulf Coast study, defendants have misrepresented the nature of Dr. Nausieda's testimony. Dr. Nausieda is a board-certified neurologist who practices in Milwaukee, Wisconsin. His clinic is one of approximately 35 clinics designated as centers of excellence by the National Parkinson's Foundation. The clinic has approximately 4,500 active patients. Dr. Nausieda testified that Parkinson's disease is a relatively new disease in that there is no reference to symptoms in medical literature until the early 1800s, when Dr. James Parkinson describes a series of patients with symptoms that have now become known as Parkinson's disease. According to Dr. Nausieda, the most common theory is that Parkinson's disease is a by-product of the Industrial Revolution, because the first reported cases of the disease occurred outside London, which was highly industrialized at the time. Dr. Nausieda reported that the next description of similar cases occurred some 20 years later in manganese-ore-crushing workers.

Dr. Nausieda went on to outline the history of the disease and his own attempts to discover its cause. Dr. Nausieda first discovered a link between welders and Parkinson's symptoms in the early 1990s when one of his patients, a retired welder, showed him an advertisement from the Chicago Tribune in which plaintiff's attorney's law firm was seeking Parkinson's patients who were welders. After discussions with the law firm, Dr. Nausieda began questioning his own patients about a potential link between welding and Parkinson's disease symptoms. Since that time, Dr. Nausieda has uncovered at least 67 of his own patients, who were originally diagnosed as suffering from Parkinson's, who actually suffer from what is, in his opinion, manganese exposure. Of these 67 patients, he does not believe any neurologist would have diagnosed them with anything other than Parkinson's disease. Dr. Nausieda's testimony was based upon his own experience and impressions from treating Parkinson's patients.

Dr. Nausieda specifically stated the Gulf Coast study is not an epidemiologic study. He admitted there is a known bias in that the group being screened was chosen by plaintiffs' lawyers attempting to find clients. Dr. Nausieda agreed the consortium behind the study hopes to uncover a group of plaintiffs and file suit on behalf of these shipyard workers who have contracted Parkinson's disease symptoms through manganese exposure. Dr. Nausieda acknowledged that there are no written findings from the study and that his data is rather "loose." The Gulf Coast study is an *ongoing* project. Dr. Nausieda made it clear the ultimate results may be different from the early

results. The Gulf Coast study was never presented as a completed epidemiologic study that must pass the *Frye* test. Accordingly, Dr. Nausieda's testimony was not "false," as defendants argue.

In addition, we agree with plaintiff that to the extent there is a disagreement among experts about the precise symptoms associated with manganese exposure, it was the jury's function to resolve any disagreement. The jury's resolution of any disagreement in favor of plaintiff is supported by the record before us. It was within the jury's province to decide the central issue in this case: whether plaintiff's central nervous system injury was, in fact, idiopathic or whether it was caused by manganese in welding fumes. The evidence here supports the jury's finding that plaintiff suffers from a central nervous system injury caused by the manganese in welding fumes. Therefore, we will not overturn the jury's verdict on the basis that no causal link between welding fumes and Parkinson's disease exists.

## II. ALLEGED ERRORS AND/OR ABUSES OF DISCRETION

Having found that defendants were not entitled to a directed verdict or a judgment *n.o.v.*, we now address defendants' alternative contention that they are entitled to a new trial because of numerous alleged prejudicial errors and/or abuses of discretion.

### A. Gulf Coast Study

■ Defendants argue that exposing the jury to testimony concerning the ongoing, unpublished Gulf Coast "study," especially without providing defendants with the documentation underlying the study, constitutes reversible error. We disagree for the following reasons.

First, as previously discussed, Dr. Nausieda's testimony about the Gulf Coast study was not "untrue," as defendants contend. Dr. Nausieda did testify that out of the 20,000 people screened, approximately 2,000, or roughly 10%, showed signs of Parkinson's; however, it is clear from his testimony that this was a preliminary estimate. Second, contrary to defendants' assertions, Dr. Nausieda's subsequent deposition testimony does not totally refute his testimony here. Dr. Nausieda's testimony in the instant case centered on his own observations through his career as a neurologist and his findings regarding a high incidence of Parkinson's-like symptoms in welders. Dr. Nausieda was candid that the screening was in its initial phases and did not place undue emphasis on the study as defendants suggest. Third, while defendants insist they were given inadequate documentary evidence so that they were unable to effectively cross-examine Dr. Nausieda, the record suggests otherwise. On cross-examination, defense counsel capably pointed out the weaknesses of the study, including the fact that the "study" was not an epidemiological study and the fact that an inherent bias exists.

Defendants further contend the error of admitting the Gulf Coast study was compounded by the trial court's refusal to allow defendants to present a study of 20,000 Caterpillar workers exposed to welding fumes. According to defendants, the Caterpillar study indicates no increase in neurological symptoms. What defendants fail to consider is that the Gulf Coast study was introduced through the testimony of Dr. Nausieda and that the study helped him to form his opinion that manganese is harmful and can cause Parkinson's symptoms. The trial court instructed the jury that the testimony was for a limited purpose:

"It is allowed so that the witness may tell you what he relied on in forming his opinions. The materials being referred to is [sic] not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give the opinion testified to by this witness."

Defendants, on the other hand, sought to introduce the Caterpillar study as evidence that plaintiff was not harmed.

The Caterpillar study was not directly responsive to the Gulf Coast study. The Gulf Coast study is limited to welders, whereas the Caterpillar study screened 20,000 people who worked at a Caterpillar plant, many of whom were not welders. The testimony of the Caterpillar witnesses was, for the most part, anecdotal and in no way qualified as an epidemiological study. In light of the trial court's considerable discretion in the admission of evidence, defendants have failed to convince us they are entitled to a new trial on the basis that the trial court allowed testimony regarding the Gulf Coast study but refused to allow testimony regarding the Caterpillar study.

## B. Sole-Proximate-Cause Defense

■ Defendants also argue they are entitled to a new trial on the basis that the trial court erroneously denied their right to present an alternative sole-proximate-cause defense against plaintiff's employer. Defendants insist the trial court erred by precluding them from presenting evidence that another factor, the condition of plaintiff's work site, was the sole cause of plaintiff's injuries. We disagree.

A manufacturer is under a nondelegable duty to produce a reasonably safe product. *Hammond v. North American Asbestos Corp.*, 97 Ill. 2d 195, 208, 454 N.E.2d 210, 217 (1983). Here, the strict liability counts sent to the jury involved a failure to warn about manganese fumes' dangers when defendants knew or should have known their product could cause central nervous system injury and a failure to provide adequate instructions about ventilation, safety equipment, or precautionary measures. The evidence established that defendants knew or should have known about the dangerous propensities of

manganese in their steel welding rods but failed to adequately warn of the hazards. Accordingly, defendants failed to adequately inform not only plaintiff but also his employer, Ameren, about the dangers of manganese in their steel welding rods. Under these circumstances, the trial court properly granted plaintiff's motion *in limine*, which barred defendants from presenting evidence or argument that Ameren's conduct was the sole proximate cause of plaintiff's injuries.

## C. Alleged Improper Comments During Trial

■ Defendants argue plaintiff's counsel repeatedly made improper comments and accusations during the trial that warrant a new trial. Defendants first complain that plaintiff's counsel repeatedly suggested to the jury, without presenting any substantive evidence, that other workers became ill as the result of welding. The allegedly improper comments refer to a worker in Hobart, Pennsylvania, and another worker at the Ameren plant. After reviewing these comments, we find that any error resulting from these or any other comments was, at worst, harmless error and does not entitle defendants to a new trial.

Defendants also complain about allegedly improper closing and rebuttal arguments by plaintiff's attorney. Defendants argue plaintiff's attorney violated an *in limine* ruling when he analogized welding fumes to asbestos, silica, and cigarettes and told the jury that manufacturers of those products had, in the past, told the public that diseases now shown to be caused by those products were "idiopathic" but that an "intelligent, enlightened, empowered jury changed all that idiopathic nonsense." Defendants further maintain that plaintiff's counsel violated another *in limine* ruling when he sarcastically referred to defense counsel as "Chicago lawyers" and suggested they would use "slick" tactics and "trick[s]."

It is well-settled that attorneys are allowed broad latitude in closing argument. *Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.*, 217 Ill. App. 3d 94, 119, 576 N.E.2d 918, 937 (1991). A judgment will only be reversed if the challenged remarks prevented a defendant from receiving a fair trial. *Decker v. Domino's Pizza, Inc.*, 268 Ill. App. 3d 521, 531, 644 N.E.2d 515, 522 (1994). Here, defendants failed to object during closing to these arguments, and after considering the comments, we do not find they rise to the level of prejudicial error. Finally, while the comments about defense counsel were inappropriate, they do not rise to the level of prejudice necessary to warrant a new trial.

## D. Manifest Weight of the Evidence

■ The final argument raised by defendants is that the verdict was against the manifest weight of the evidence. A verdict is only

against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454, 603 N.E.2d 508, 512-13 (1992). Our review of the evidence at the trial establishes that the jury's verdict is not against the manifest weight of the evidence.

We previously set forth the evidence in support of the jury's verdict in issue I and need not repeat that evidence here. The record establishes plaintiff suffers from a central nervous system injury. Plaintiff's experts testified there was a causal link between the manganese in defendants' welding rods and plaintiff's condition. Defendants' experts testified that plaintiff suffers from idiopathic Parkinson's disease and that the cause of his disease is unknown. Numerous scientific articles were introduced by the parties. It was the jury's function to resolve conflicts in the evidence. After careful consideration, we cannot say that the jury's verdict was against the manifest weight of the evidence.

## CONCLUSION

The record does not indicate that the jury's verdict was inconsistent with the evidence or the result of undue prejudice. We find the trial court properly denied defendants' motions for a directed verdict and for a judgment *n.o.v.* Likewise, defendants have failed to convince us they are entitled to a new trial due to any single error or the cumulation of errors.

For the foregoing reasons, the motion to strike is denied, and the judgment of the circuit court of Madison County is hereby affirmed.

Affirmed.

DONOVAN and WELCH, JJ., concur.